FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND
2011 NOV 18 A 10: 37
CLERK'S OFFICE
AT BALTIMORE
BY_____DEPUTY

IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND, NORTHERN DIVISION

UNITED STATES OF AMERICA

    v.

TIMOTHY WILSON, ET AL.

                 CRIMINAL NO.: WDQ-10-0488

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM OPINION

Timothy M. Wilson and Luis R. Ahorrio, Jr. (the "Defendants") are charged with conspiracy to distribute crack cocaine and other offenses. On July 29 and November 15, 2011, the Court heard testimony and arguments on several pending motions.[1] For the following reasons, the Court will deny the Defendants' motions to suppress and exclude evidence, compel prosecution review of witnesses and disclosure of evidence, and for severance.[2]

I. Background

On July 23, 2010, Maryland State Police ("MSP") Corporal H. Kennard saw a Toyota Corolla (the "Car") with a New Jersey

---

[1] Pending are Wilson's motions to suppress evidence (ECF Nos. 28, 71, and 79) and sever (ECF No. 29); Ahorrio's motions to disclose Fed. R. Evid. 801 material (ECF No. 40), disclose evidence subject to a motion to suppress (ECF No. 41), suppress evidence (ECF No. 43), exclude evidence (ECF Nos. 64 and 88), and compel prosecution review of witnesses (ECF No. 67); and the Defendants' motions to adopt each other's motions (ECF Nos. 30 and 39) and for leave to file more motions (ECF Nos. 31, 38, and 66).

[2] The Court will grant the Defendants' unopposed motions to adopt each other's motions and for leave to file more motions.

license plate speeding on U.S. Route 113 in Worcester County, Maryland. Compl. ¶ 3; ECF No. 47, Ex. 1 [hereinafter Crim. Inv. Report] at 5-6.[3] The Car was also following another car too closely. *Id.* at 6. Ahorrio was driving, and Wilson was the passenger. *Id.*

At about 7:26 p.m., Kennard stopped the Car. *Id.*; ECF No. 47, Ex. 2 [hereinafter Video]. Kennard told the Defendants that the stop was being recorded, and asked for Ahorrio's license and registration. Crim. Inv. Report 6. Ahorrio gave Kennard a Pennsylvania driver's license and a car rental agreement. *Id.* Wilson gave Kennard a New Jersey driver's license. *Id.* at 6. As Wilson opened his wallet, he revealed what appeared to be a police badge. Compl. ¶ 3. Ahorrio's hands were "very shaky," and Wilson's breathing was "shallow and rapid." Crim. Inv. Report 7.

Kennard returned to his car, and activated the sound recording system. *Id.* at 6; Video at 7:27 p.m. MSP K-9 Trooper First Class Dana Orndorff arrived and approached Kennard's window.[4] Compl. ¶ 4; Crim. Inv. Report 6. Kennard told Orndorff

---

[3] The speed limit was 55 miles per hour; using a laser, Kennard determined that the Car was traveling at 65 miles per hour. Crim. Inv. Report 6.

[4] In 2009 and 2010, Orndorff and his dog, Camo, were certified as a K-9 Drug Detection Team. ECF No. 68, Ex. 1 at 1-2. Camo's training and evaluation exercises reveal that he has never missed a target, and has had one false alert in training. *See*

that Ahorrio was not listed on the rental agreement and he "wanted to investigate further." Crim. Inv. Report 6; Video at 7:27 p.m.

Kennard left his car and motioned for Ahorrio to leave the Toyota. *Id.*; Video at 7:28 p.m. Kennard asked where Ahorrio lived; Ahorrio said that his "new address" was in New York, and Wilson had rented the Car. Crim. Inv. Report 6. Ahorrio also said that he had driven in a separate car to Wilson's house in New Jersey that day, and they were traveling to see drag races. Video at 7:29 p.m.

Kennard then approached Wilson, still sitting in the Car, and informed him that Ahorrio should be added as a driver on the rental agreement. *See id.* Wilson said they were going to North Carolina for drag races. Crim. Inv. Report 6. The two spoke briefly about drag racing, then Wilson said that he understood that Kennard had a job to do, and he had "a brother on the job." Video at 7:30 p.m. Wilson "continu[ously] displayed" the badge in his wallet. Crim. Inv. Report 6.

While Kennard was speaking to Wilson, Orndorff approached Ahorrio. *See* Crim. Inv. Report 6. Ahorrio told Orndorff that

---

ECF No. 72, Ex. A. Camo's field records indicate that he has alerted in 77 traffic stops, and in 24 cases (about 31 percent) no drugs had been recovered. *See* ECF No. 72, Ex. B.

3

he and Wilson were driving to drag races in Georgia. *Id.* This conversation was not recorded.

Kennard then asked Ahorrio why he had not obtained a New York license, and whether his Pennsylvania license was valid. *Id.* Ahorrio stated that he had just moved, and his license was "supposed to be" valid. Video at 7:30-31 p.m. Ahorrio "started to become increasingly nervous as he seemed unsure of his answers." Crim. Inv. Report 6.

The officers returned to Kennard's car. *See id.* Orndorff said that Ahorrio had informed him that he and Wilson were traveling to Georgia for drag races. *Id.* Kennard told Orndorff that he would "talk to [Ahorrio] a little bit more" while issuing him a warning. Video at 7:32 p.m. Kennard ran Ahorrio's license and confirmed it was valid. *Id.* Kennard returned to Ahorrio and told him that he would be issued a written warning. Crim. Inv. Report 6; Video at 7:33 p.m. As Kennard was preparing the warning, he "started a casual conversation" with Ahorrio about New York for about two minutes. *Id.*; Video at 7:33-35 p.m.

Kennard then said that his agency was conducting aggressive traffic enforcement. Crim. Inv. Report 6; Video at 7:35 p.m. He asked Ahorrio if all the property in the Car was his, and if he would mind a canine scan of the Car. *Id.* Ahorrio stated

4

that only one bag in the Car was his, and the officers would need Wilson's consent to the scan. *Id.*

Kennard returned briefly to his car and told Orndorff that he wanted to conduct a canine sniff of the Toyota. Video at 7:35 p.m. Kennard then conducted a consensual pat-down search of Ahorrio, and directed him to stand in front of Kennard's car. *Id.* at 7; Video at 7:36 p.m. Orndorff opened the passenger side door of the Toyota and had Wilson get out. Crim. Inv. Report at 7; Video at 7:36 p.m. He did not tell Wilson that he could close the car door.[5] Hr'g Tr. 136:16–18 July 29, 2011. The door remained open as Orndorff conducted a consensual pat-down of Wilson near the trunk of the car. Crim. Inv. Report at 7; Video at 7:36 p.m. Wilson said to "make it quick" because he needed to use the restroom. *Id.*

After the pat-down, Kennard indicated that Wilson should stand by Ahorrio. Video at 7:36 p.m. Kennard asked Wilson if everything in the Car was his. *Id.* Wilson replied, "I guess, yeah." *Id.* Wilson pulled out his cell phone, and Kennard told him to put it away. *Id.* Wilson said that he was playing a game on it. *Id.*

---

[5] Orndorff testified that he "gave [Wilson] an opportunity to close it" when he [Ordnorff] walked away. Hr'g Tr. 136:11–12 July 29, 2011.

At 7:37 p.m., Orndorff began walking K-9 Camo around the Car. Video.[6] The passenger door was open, and Camo put his front paws on the passenger side floorboard and sniffed the floor, seat, console, and glove box. Hr'g Tr. 120:18-21, 137:16-19 July 29, 2011. Camo also stood on his hind legs near the driver's door. Video at 7:37 p.m.

Between 7:37 and 7:38 p.m. -- 11 to 12 minutes after the initial stop -- Kennard told the Defendants that the dog had "alerted to the car." Video. Kennard asked if there was "any reason why" the dog might have alerted; Wilson said he "wouldn't know" because he had just picked up the car. Video at 7:38 p.m.

At 7:39 p.m., Kennard began to search the Toyota. Crim. Inv. Report 7; Video.[7] He found two bags which Wilson said were his. Crim. Inv. Report 7. Inside one bag, Kennard found a live shotgun shell. *Id.* Kennard asked if there was a gun inside the Car. *Id.* Wilson said no, and that he had borrowed the bag. *Id.*; Video at 7:41 p.m.

Under the front passenger seat, Kennard found a large brown paper bag. Crim. Inv. Report 7. After opening it, he smelled

---

[6] Because the Defendants were standing in front of Kennard's car, they partially obstructed the camera's view of the Toyota. Video at 7:37 p.m. Orndorff testified that Wilson and Ahorrio were told to stand in front of the camera for the officers' safety.

[7] The Defendants remained in front of Kennard's car, blocking part of the camera's view of the Car. Video at 7:39 p.m.

cocaine. *Id.* Inside was a white bag containing a zip-lock bag with 347 grams of crack cocaine. *Id.;* Compl. ¶ 6. The brown bag also had a July 16, 2010 receipt from a Burger King less than a mile from Ahorrio's New York residence. *Id.* ¶ 7.

At 7:49 p.m., the Defendants were arrested for drug violations, and taken to the MSP Barrack in Berlin, Maryland. Video; Compl. ¶ 5; Crim. Inv. Report 7. There, Wilson was advised of his *Miranda* rights, and chose to seek counsel. Compl. ¶ 8. Ahorrio waived his *Miranda* rights. *Id.* ¶ 7. He explained that that morning, Wilson told him that he was renting a car to see drag races. *Id.* Ahorrio then drove to Wilson's New Jersey house, and Wilson told him to drive the rental car. *Id.* Ahorrio stated that they had been traveling to North Carolina. *Id.*

On July 26, 2010, the Defendants were charged by criminal complaint. On August 11, 2010, they were indicted for conspiring to distribute and possessing with intent to distribute 50 grams or more of crack cocaine, and aiding and abetting, in violation of 21 U.S.C. §§ 841(a)(1) and 846, and 18 U.S.C. § 2. ECF No. 15.

On December 3, 2010, Wilson moved to suppress (ECF No. 28), sever (ECF No. 29), adopt Ahorrio's motions (ECF No. 30), and file more motions (ECF No. 31). On December 20, 2010, Ahorrio moved to file more motions (ECF No. 38), adopt Wilson's motions

(ECF No. 39), and for disclosure of Fed. R. Evid. 801(d)(2)(E) material (ECF No. 40) and evidence subject to a motion to suppress (ECF No. 41). On December 22, 2010, Ahorrio moved to suppress. ECF No. 43.

On January 14, 2011, the Government opposed most of those motions. ECF No. 47. The Government consented to the Defendants' adoption of each other's motions, if they "particularize[d] the basis for adopting the co-defendant's motions" when relying on new authorities. ECF No. 47 at 18. The Government also agreed that the Defendants could file more motions if "there is a satisfactory explanation as to why the motion was filed after the deadline set by the Court." ECF No. 47 at 18.

On May 6, 2011, Ahorrio moved to exclude evidence (ECF No. 64), file more motions (ECF No. 66), and compel prosecution review of witnesses (ECF No. 67). On May 23, 2011, the Government opposed all but Ahorrio's request to file more motions. ECF No. 68. The Government also provided Orndorff and Camo's certificates. *Id.*, Ex. 1. In or before June 2011, the Government provided Camo's training and field records. *See* ECF No. 72, Exs. A–B.

On June 24, 2011, Wilson filed a supplemental motion to suppress, attacking Camo's reliability. ECF No. 71. On July 8, 2011, the Government opposed that motion. ECF No. 72. On July

8

26, 2011, Wilson filed a supplemental memorandum in support of his motion to suppress. ECF No. 73.

On July 29, 2011, the Court held a motions hearing. *See* ECF No. 78.

On August 17, 2011, Wilson filed another supplemental memorandum in support of his motion to suppress, based on testimony at the hearing. ECF No. 79. On September 13, 2011, the Government filed its opposition. ECF No. 80. On November 2, 2011, Ahorrio filed a supplemental motion to exclude evidence. ECF No. 88. The Government did not oppose that motion.

On November 15, 2011, the Court held the continued motions hearing.

II. Analysis

A. Motions to Suppress (ECF Nos. 28, 43, 79)

Wilson and Ahorrio moved to suppress all tangible and derivative evidence seized from the Car. *See* ECF No. 28 at 9; ECF No. 43 at 1. They argued that there was no probable cause or reasonable suspicion for the stop, Camo entered the Car unlawfully, and they had not been merely stopped but formally arrested. ECF No. 28 at 5-9; ECF No. 43 at 1-2, 4-5; ECF No. 79 at 1. The Government countered that the stop was a constitutional detention not an arrest, Camo's entry into the Car was not a search, probable cause to search the Car existed

before the canine sniff, and Camo would have alerted to the Car even if the passenger door had not been open.   ECF No. 47 at 6, 8 n.4; ECF No. 80 at 2.

1. The Defendants' Detention

The Defendants argued that (1) there was no probable cause for the stop,[8] and (2) if the initial stop was legal, Kennard lacked reasonable suspicion to extend the detention.   ECF No. 28 at 5-9; ECF No. 43 at 1-2, 4-5.   They also argued that the officers told them to lean against Kennard's car, obscuring the camera's view so there is no record of Camo's alert.   ECF No. 43 at 3.[9]   The Government countered that the entire detention was permissible (1) as part of the initial stop, or (2) based on reasonable suspicion that the Defendants were engaged in criminal activity.   ECF No. 47 at 6.

Temporarily detaining an individual during an automobile stop, "even if only for a brief period and for a limited purpose," is a seizure under the Fourth Amendment.   *Whren v. United States*, 517 U.S. 806, 809-10 (1996).   Thus, the stop is "subject

---

[8] Wilson denied that Ahorrio was speeding or following a car too closely.   ECF No. 28 at 5.

[9] Ahorrio also argued that he did not consent to the scan, and if Wilson did, "such consent after an unreasonable detention was neither informed nor voluntary."   ECF No. 43 at 3.   As will be explained in this Part, however, the stop was not unreasonably long, and a prolonged stop would have been justified because of Kennard's reasonable suspicion of the defendants' criminal activity.

to the constitutional imperative that it not be unreasonable under the circumstances." *Id.* at 810. A stop is reasonable when police have probable cause to believe that a traffic violation has occurred. *Id.*

If an officer observes such a violation, he is justified in detaining the car "for as long as it takes to perform the traditional incidents of a routine traffic stop." *United States v. Branch*, 537 F.3d 328, 335 (4th Cir. 2008). A prolonged stop requires the driver's consent or reasonable suspicion[10] of criminal activity. *Id.* at 336; *United States v. Foreman*, 369 F.3d 776, 781 (4th Cir. 2004).

Because Ahorrio was driving 10 miles above the speed limit and following a car too closely, Kennard had probable cause to stop the Toyota.[11] Kennard was justified in detaining the Car while he performed "traditional incidents" of the stop, which

---

[10] Reasonable suspicion is supported by "specific and articulable facts which, taken together with rational inferences from those facts, evince more than an inchoate and unparticularized suspicion or hunch of criminal activity." *United States v. Mason*, 628 F.3d 123, 128 (4th Cir. 2010) (citation and internal quotation marks omitted). This standard considers the totality of the circumstances and affords "due weight to common sense judgments reached by officers in light of their experience and training." *United States v. Perkins*, 363 F.3d 317, 321 (4th Cir. 2004).

[11] *See* Crim. Inv. Report 5-6; *Whren*, 517 U.S. at 810; *United States v. Hassan El*, 5 F.3d 726, 730 (4th Cir. 1993) ("When an officer observes a traffic offense--however minor--he has probable cause to stop the driver of the Car.").

included reviewing the rental agreement, running Ahorrio's license, and beginning to prepare a warning.[12]   Kennard also had Orndorff perform a canine scan of the Car while Kennard wrote up the warning.   Crim. Inv. Report 6.[13]   Camo alerted about 11 or 12 minutes after the initial stop.[14]   Although the Defendants argue that there is no record of the alert because Kennard's car camera is largely blocked, ECF No. 43 at 3, at about 10 minutes into the stop, the video shows Camo walking around the Car, breaking from his path by the passenger side, and standing on his hind legs near the driver's door.   *See* Video at 7:37 p.m. After the alert, Kennard had probable cause to search the Car. *United States v. Jeffus*, 22 F.3d 554, 557 (4th Cir. 1994).

Even if the scan had not been performed within a reasonable time for a routine traffic stop, continued detention would have been permissible because Kennard had reasonable suspicion that

---

[12] *Branch*, 537 F.3d at 335; *Foreman*, 369 F.3d at 781 ("[D]uring a routine traffic stop, an officer may request a driver's license and Car registration, run a computer check, and issue a citation."); Crim. Inv. Report 6.

[13] Officers may conduct a canine scan--which is not a Fourth Amendment search--if performed within "'the time reasonably required' to issue a traffic citation."   *Branch*, 537 F.3d at 335-36 (*quoting Illinois v. Caballes*, 543 U.S. 405, 407-09 (2005)).

[14] Video at 7:37-38 p.m.; *United States v. Curry*, No. 09-0483, 2010 WL 2858009, at *3 (D. Md. July 19, 2010) (sixteen-minute stop before dog alerted was "an entirely reasonable duration for a routine traffic stop" (*citing, inter alia, Branch*, 537 F.3d 328)).

the Defendants were involved in criminal activity. *See Foreman*, 369 F.3d at 781. Kennard saw that Ahorrio's hands were "very shaky," and Wilson's breathing was "shallow and rapid." Crim. Inv. Report 6-7. Although Ahorrio was driving the Car, he was not listed as a driver on the rental agreement. *Id.* at 6. Ahorrio's license was from Pennsylvania, even though he said he lived in New York. *Id.* Wilson's wallet contained an item resembling a police badge, and he stated that he had a "brother on the job." *Id.*; Video at 7:30 p.m. Kennard may have reasonably suspected that Wilson was trying to curry favor with law enforcement. *See* ECF No. 47 at 10. The Defendants gave conflicting statements about the destination of the drag races; Wilson stated they were traveling to North Carolina, but Ahorrio said Georgia. Crim. Inv. Report 6.[15] Further, although Ahorrio had driven to Wilson's house in New Jersey that day, the Defendants had been driving a rental car. *Id.* A reasonable officer may have assumed that the Defendants were attempting to hide their identities if the Car was connected to criminal activity. ECF No. 47 at 11.

---

[15] Only after being arrested and waiving his *Miranda* rights did Ahorrio state that they had been driving to North Carolina. Compl. ¶ 7.

Although the Defendants offered neutral reasons for these observations,[16] "factors which by themselves suggest only innocent conduct may amount to reasonable suspicion when taken together." *Perkins*, 363 F.3d at 321. Thus, it was reasonable for Kennard to suspect that the Defendants were involved in criminal activity, and this reasonable suspicion justified their detention.[17]

---

[16] For example, the defendants note that travelers often allow companions to drive. *See* ECF No. 28 at 8-9.

[17] *See, e.g.*, *United States v. Sprinkle*, 106 F.3d 613, 618 (4th Cir. 1997) (courts must consider the "totality of the circumstances . . . in deciding whether the officers had a reasonable suspicion of criminal activity"); *United States v. Brown*, Nos. 93-5378, 93-5379, 93-5380, 1994 WL 89799, at *1, *4 (4th Cir. Mar. 22, 1994) (officers had reasonable suspicion of criminal activity because the driver was not listed on the rental agreement as an authorized driver, he was nervous, and the driver and passengers gave inconsistent statements about their destination).

In support of his motion to suppress, Wilson submitted *United States v. Digiovanni*, 650 F.3d 498 (4th Cir. 2011). ECF No. 73 at 1-2. There, an officer impermissibly delayed a traffic stop by devoting the "bulk" of the stop to investigating whether the car contained drugs. *See Digiovanni*, 650 F.3d at 509. The officer also waited more than 10 minutes to check the defendant's license. *Id.* at 510. By contrast, most of the stop in this case was dedicated to "traditional incidents," such as running Ahorrio's license five or six minutes into the stop, reviewing the rental agreement, and beginning the warning. *See Branch*, 537 F.3d at 335; Crim. Inv. Report 6; Video at 7:32 p.m. The Defendants were not questioned about the shotgun shell in Wilson's bag until Kennard began searching the Car after Camo's alert. *See id.* at 7:39-41 p.m.

14

2. Whether the Stop Was an Arrest

The Court rejects the Defendants' contention that they were arrested before the search of the Car. *See* ECF No. 43 at 4. An arrest occurs when the "suspect's freedom of action is curtailed to a degree associated with formal arrest." *Park v. Shiflett*, 250 F.3d 843, 850 (4th Cir. 2001). A stop does not turn into an arrest merely because the suspect does not feel free to leave. *United States v. Elston*, 479 F.3d 314, 320 (4th Cir. 2007). The Defendants were detained for the duration "necessary to verify . . . suspicion" of criminal activity. *See id.*; Crim. Inv. Report 6-7; *see generally* Video. Further, no force was used, neither defendant was handcuffed until the drugs were found, and Wilson was permitted to stay in the car until just before Camo's scan.[18]

3. Camo's Entrance into the Car

The Defendants argued that Camo entered the Car unlawfully because Ordnorff left the door open after directing Wilson to leave the passenger side of the Car. ECF No. 79 at 1-3; *see* Hr'g Tr. 136:16-18 July 29, 2011. Thus, they argued, Camo's entry of the Car was "an unlawful intrusion and a search without probable cause." ECF No. 79 at 2. The Government countered

---

[18] Even "[d]rawing weapons, handcuffing a suspect, placing a suspect in a patrol car for questioning, or using or threatening to use force does not necessarily elevate a lawful stop into a custodial arrest." *United States v. Leshuk*, 65 F.3d 1105, 1109–10 (4th Cir. 1995).

15

that Camo's entry was not a search, because the canine acted instinctively, without prompting by Orndorff. ECF No. 80 at 2. Alternatively, the Government argued that the inevitable discovery doctrine applied, and that probable cause to search the Car existed before Camo's entry. *Id.*

Although a drug dog scan of a car's exterior is not a search under the Fourth Amendment, *Branch*, 537 F.3d at 335-36, scanning the interior "raises a different set of issues . . . because persons have reasonable expectations of privacy in the[ir car] interiors," *United States v. Batista*, No. L-10-0561, 2011 WL 1636401, at *3 (D. Md. Apr. 27, 2011) (*citing Almeida-Sanchez v. United States*, 413 U.S. 266 (1973)).[19] Generally, a drug dog may enter the car interior only if he is acting "instinctive[ly]"; officers may not act with the intent to "facilitate" a dog sniff of the interior.[20]

There is no indication that the officers intended to facilitate Camo's sniff of the interior. Wilson's car door was open to permit Orndorff to conduct a pat-down. *See* Crim. Inv. Report

---

[19] During a traffic stop, police may "open a car's windows or doors to afford the dog a better field of scent." *Batista*, 2011 WL 1636401, at *4.

[20] *United States v. Curry*, No. 09-0483, 2010 WL 2858009, at *4 (D. Md. July 19, 2010) (*citing United States v. Winningham*, 140 F.3d 1328 (10th Cir. 1998); *United States v. Pierce*, 622 F.3d 209, 214-15 (3d Cir. 2010); *United States v. Stone*, 866 F.2d 359 (10th Cir. 1989)). *See also Batista*, 2011 WL 1636401, at *4.

at 7. Orndorff testified that he "gave [Wilson] an opportunity to close [the door] by [Ordnorff] walking away." Hr'g Tr. 136:11-12 July 29, 2011. There is no evidence that Orndorff "asked [Wilson] to open the [car door] so [that Camo] could jump in," or "encouraged" him to enter.[21] Further, Camo sniffed the interior within a reasonable time for the stop,[22] and he was never unleashed.[23] Thus, the Defendants have shown no violation of the Fourth Amendment.

The drugs are also admissible under the inevitable discovery doctrine.[24] Even if Camo had not entered the Car, the police would have found the drugs. The canine alerted near the driver's side front door by standing on his hind legs and

---

[21] *Stone*, 866 F.2d at 364 (drug dog's "instinctive" jump into a hatchback was constitutional); *see also Batista*, 2011 WL 1636401, at *4 (drug dog's entry into a car interior was permissible because, *inter alia*, "it [did] not appear that [the officer] left the door open . . . to invite [the drug dog] to enter").

[22] Camo entered the Car about 10 minutes after the initial stop, and he spent only seconds inside.

[23] *See generally* Video; *see supra* Part II.A.1; *Winningham*, 140 F.3d at 1331 (finding these factors instructive in determining that officers facilitated a drug dog's interior sniff).

[24] *See Nix v. Williams*, 467 U.S. 431, 444 (1984) ("if the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means," it should be admitted).

putting his front paws on the Car. This alert provided probable cause to search. *See Jeffus*, 22 F.3d at 557.[25]

B. Motions to Exclude Evidence Related to Camo's Alert (ECF Nos. 64, 88)

Ahorrio initially complained that the Government withheld information about Camo's training and false alerts. ECF No. 64 at 3-4. Ahorrio sought this information to challenge the admission of the alert, and Orndorff as an expert witness. *See id.* He argued that the only "ameliorative measure" was to exclude all testimony related to the alert, including Orndorff's testimony about Camo. *Id.* at 4.

After this motion (ECF No. 64) was filed, the Government produced Orndorff's 2009 training certificate, Orndorff and Camo's 2009 and 2010 drug detection team certificates, and Camo's training and field records. *See* ECF No. 68, Ex. 1 at 1-3; ECF No. 72, Exs. A-B. Thus, Ahorrio's motion to exclude evidence (ECF No. 64) will be denied as moot.

Ahorrio then filed a supplemental motion to exclude the canine alert evidence because it "fails the most basic criteria of science" under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). ECF No. 88 at 2-3. He contended that "the utter lack of empirical testing that has been done in the field

---

[25] Because the Court finds two grounds on which the drugs are admissible, it need not determine whether probable cause existed before Camo entered the car.

of canine narcotics detection is devastating to any claim that this is scientifically based or generally accepted as reliable." *Id.* at 3. He also argued that Orndorff's testimony about Camo would violate his right to confrontation, because the defense cannot "cross-examine the technician who conducted the test in question – K-9 Camo." *Id.* at 7-8.

Ahorrio's supplemental motion is not persuasive and will be denied. Several other courts have found canine alert evidence sufficiently reliable to be admissible under *Daubert*,[26] or have determined that dog handlers' testimony is not subject to a *Daubert* analysis.[27] Not surprisingly, Ahorrio cites no case law supporting a right to cross-examine a dog.[28]

---

[26] *See, e.g.*, *United States v. Hornbeck*, 63 F. App'x 340, 342 (9th Cir. 2009) (district court acted within discretion in admitting evidence about bloodhound alert); *United States v. Graham*, No. 08-CR-6259L, 2011 WL 1885343 (W.D.N.Y. May 18, 2011) (testimony about the training of canines and the reliability of their actions is proper under *Daubert*).

[27] *See, e.g.*, *United States v. Berrelleza*, 90 F. App'x 361, 365 (10th Cir. 2004) (district court did not abuse discretion in denying *Daubert* hearing to test the expertise of the dog or its handler); *United States v. Morales*, 489 F. Supp. 2d. 1250, 1266-67 (D.N.M. 2007) ("a *Daubert* hearing is the wrong procedural tool to challenge the reliability of a drug detection dog" because the purpose of the handler's testimony is not to "prove that the chemicals found were actually an illegal narcotic" but rather, to establish that the handler had "an articulable basis" for believing that drugs were present), *quoting United States v. Outlaw*, 134 F. Supp. 2d 807, 810 (W.D. Tex. 2001). *But see United States v. Hebshie*, 754 F. Supp. 2d 89, 116 (D. Mass. 2010) (*Daubert* hearing may be appropriate when dog handler claims that his dog had "superior olfactory capabilities" and the handler had a "unique ability to read the dog").

C. Supplemental Motion to Suppress Based on Camo's Records
   (ECF No. 71)

After the Government disclosed Camo's training and field records, Wilson filed a supplemental motion to suppress tangible and derivative evidence seized from the Car. ECF No. 71 at 1. Wilson argued that, because drugs were recovered in only 24 out of 77 cases in which Camo alerted,[29] his alert is an unreliable indicator of the presence of drugs. *See id.* at 2. Thus, Wilson argued that there was no probable cause to search the Car. *Id.*

A drug dog alerts in the "presence of an odor--even if the controlled substance is no longer present at the site of the alert." *United States v. Brooks*, 589 F. Supp. 2d 618, 630-31 (E.D. Va. 2008). An alert establishes probable cause if there are "some indicia of reliability for the alert." *United States v. Koon Chung Wu*, 217 F. App'x 240, 245 (4th Cir. 2007). Evidence of a dog's "training and certification [is] enough by itself to

---

[28] He cites two cases that are inapposite: *Bullcoming v. New Mexico*, 131 S. Ct. 2705 (2011) (defendant had right to confront analyst who certified blood-alcohol analysis report), and *Melendez-Diaz v. Massachusetts*, 129 S. Ct. 2527 (2009) (government must produce analyst for cross examination). Ahorrio compares Camo to a technician who reads results from a machine, but the machine is the more appropriate analogy to the dog. The "technician" would be the dog's handler.

[29] Although Wilson initially asserted that Camo correctly alerted only 23 out of 78 times, ECF No. 71 at 2, the Government notes that the correct ratio is 24 out of 77, ECF No. 72 at 4. Wilson has not contradicted the Government.

establish [the dog's] reliability so that his positive alerts for controlled substances establish[] probable cause." *Id.*[30]

Orndorff's 2009 K-9 Training School certificate and the Orndorff-Camo November 2009 and 2010 drug detection team certificates establish Camo's reliability. *See id.;* ECF No. 68, Ex. 1 at 1-3. Further, Camo's records show that he accurately detects drugs. Camo's training and evaluation exercises indicate that he has never missed a target, and falsely alerted only once. *See* ECF No. 72, Ex. A. In the 53 field cases in which Camo alerted but drugs were not discovered, there was reason to believe that the odor of drugs was in the searched cars. *See Brooks*, 589 F. Supp. 2d at 630-31. For example, in 20 of the false positive cases, officers had direct evidence that drugs or drug users had recently been in the car.[31] Most of the other 33 false positive reports indicate indirect evidence of drugs.[32] Thus, it is reasonable to conclude that Camo's "false positives" are

---

[30] *See also United States v. Stanley*, 4 F. App'x 148, 150 (4th Cir. 2001) (testimony about officer's "familiarity with the [drug] dog and its training [was] sufficient to establish the dog's reliability").

[31] *See, e.g.*, ECF No. 72, Ex. B at 49 (Jan. 22, 2010 scan report noting that "the driver admitted to having friends in the Car who had smoked marijuana recently"); ECF No. 72, Ex. B at 50 (Jan. 28, 2010 scan report noting that "the driver admitted to smoking marijuana in the Car").

[32] *See, e.g.*, ECF No. 72, Ex. B at 62 (June 3, 2010 scan report noting "[n]umerous air fresheners" in a car "[c]oming from and going to source drug areas").

attributable to the lingering odor of drugs, and his skills and reliability are more accurately measured by his training and evaluation records.[33]    Thus, this motion will be denied.

D. Motion to Sever Defendants (ECF No. 29)

In moving to sever, Wilson sought to be tried separately from Ahorrio "[t]o the extent that [conflicting] defenses are presented by the Defendants." ECF No. 29 at 3.

Generally, defendants indicted together should be tried jointly, especially if they are charged with participating in the same conspiracy. *United States v. Shealey*, 641 F.3d 627, 632 (4th Cir. 2011); *United States v. Akinkoye*, 185 F.3d 192, 197 (4th Cir. 1999). However, Fed. R. Crim. P. 14 provides:

> If the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the [G]overnment, the [C]ourt may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires.

Under Rule 14, "[t]he defendant bears the burden of showing that a joint trial would be so unfairly prejudicial that a miscarriage of justice would result." *United States v. Williams*, 10 F.3d 1070, 1080 (4th Cir. 1993).

---

[33] *See, e.g.*, *United States v. McNicoll*, 2008 WL 4087746, at *2 n.3 (S.D. Ga. Sept. 3, 2008) (despite falsely alerting 25 out of 30 times, drug dog's alert established probable cause; the handler testified that upon many false alerts, the occupant admitted recent drug use or presence, and the dog had demonstrated a high success rate during training).

Mutually antagonistic defenses are not *per se* prejudicial, and a Rule 14 severance should be granted only if there is a "serious risk" that a joint trial would compromise one of the defendant's specific trial rights. *Zafiro v. United States*, 506 U.S. 534, 539 (1993). Further, the joined defendants must show that the "conflict is of such magnitude that the jury will unjustifiably infer that this conflict alone demonstrates that both are guilty." *United States v. Smith*, 44 F.3d 1259, 1267 (4th Cir. 1995). Severance is not warranted merely because defendants may have a better chance of acquittal if tried separately. *Zafiro*, 506 U.S. at 540.

Wilson did not explain how a joint trial would compromise a specific trial right or create prejudice to the extent that both defendants would be found guilty. *See* ECF No. 47 at 15-17.[34] Thus, this motion will be denied.

E. Motions for Disclosure of Fed. R. Evid. 801(d)(2)(E) Material (ECF No. 40) and Evidence Subject to a Motion to Suppress (ECF No. 41)

Ahorrio sought to compel the disclosure of any co-defendant or co-conspirator statements that the Government intends to

---

[34] *See, e.g.*, *Zafiro*, 506 U.S. at 540 (affirming district court's denial of motion to sever; the defendants had not "articulate[d] any specific instances of prejudice").

offer under Fed. R. Evid. 801(d)(2)(E).[35] ECF No. 40 at 1. Ahorrio also sought to compel any evidence that may be subject to a motion to suppress. ECF No. 41 at 1.

The Government provided discovery describing the Defendants' statements during the stop, including the Video that contains some of these statements. ECF No. 47 at 17. The Government also produced or made available for inspection all of its evidence that may be subject to a motion to suppress or introduced at trial. *Id.* at 18. The Government noted that if it obtains any other statements, or evidence subject to a motion to suppress or to be used at trial, it will disclose that information. *Id.* Thus, these motions will be denied as moot.

F. Motion to Compel Prosecution Review of Witnesses (ECF No. 67)

Ahorrio asserted that because the MSP had been forced to enter into consent decrees to prevent biased policing,[36] the Government cannot be entrusted to ensure the accuracy of its witnesses' backgrounds. *See* ECF No. 67 at 2. Ahorrio argued that the Government should be required to review the personnel files for impeachment or exculpatory information of (1) its

---

[35] Under this Rule, "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy" is a party-opponent admission and admissible against the defendant.

[36] *See, e.g.*, *Wilkins v. Md. State Police*, No. CCB-93-0468, ECF No. 122.

witnesses, and (2) those who "may have had substantial contact with and influence upon" them. *See id.* at 3.

Ahorrio relied on, *inter alia*, *United States v. Henthorn*, in which the Ninth Circuit held that the Government "has a duty to examine personnel files upon a defendant's request for their production," regardless of a showing of materiality. 931 F.2d 29, 31 (9th Cir. 1991); ECF No. 67 at 3.[37]

The Government must disclose exculpatory evidence, which includes information that tends to impeach or discredit its witnesses. *Brady v. Maryland*, 373 U.S. 83, 87 (1964); *Giglio v. United States*, 405 U.S. 150, 154-55 (1972). However, other circuits have refused to follow *Henthorn*,[38] and the Fourth

---

[37] Ahorrio also cited *United States v. Jennings*, which essentially re-affirmed *Henthorn*, but held that prosecutors need not personally review personnel files. 960 F.2d 1488, 1491-92 & n.3 (9th Cir. 1992); ECF No. 67 at 4. Ahorrio further relied on *United States v. Kiszewski*, in which the Second Circuit held that the district court should have compelled production of an FBI agent's personnel files or conducted an *in camera* inspection. 877 F.2d 210, 215-16 (2d Cir. 1989); ECF No. 67 at 3.

[38] *See, e.g.*, *United States v. Quinn*, 123 F.3d 1415, 1421-22 (11th Cir. 1997) (declining to follow *Henthorn* and rejecting defendant's argument that the Government should have been required to disclose or allow inspection of personnel records without showing materiality); *see also United States v. Navarro*, 737 F.2d 625, 630-32 (7th Cir. 1984) (district court properly refused to inspect or compel production of a witness file that may have contained impeachment material; "mere speculation [that a Government file may contain *Brady* material] would convert *Brady* into a discovery device and impose an undue burden upon the district court").

Circuit has indicated that "[m]ere speculation about the existence of potentially exculpatory or impeaching evidence is insufficient to give the defense access to materials under *Brady* and *Giglio*." *United States v. Jones*, 378 F. App'x 359, 360 (4th Cir. 2010) (*citing, inter alia, Navarro*, 737 F.2d at 630-31).

The Government argued that it intends to review evidence favorable to the Defendants that is "'known to the others acting on the [G]overnment's behalf in the case, including the police.'" ECF No. 68 at 5 (*quoting Kyles v. Whitley*, 514 U.S. 419, 437 (1995)).[39] The Government said it also intends to disclose its witnesses' prior inconsistent statements. *Id.* (*citing Spicer v. Roxbury Corr. Inst.*, 194 F.3d 547, 556-57 (4th Cir. 1999)).[40]

Insofar as Ahorrio seeks to require the Government to produce impeachment information of which it is or will be aware, his motion will be denied as moot. To the extent that Ahorrio seeks to require the Government to review personnel files, the motion will be denied on the merits. To rule otherwise would place an "unacceptable burden" on prosecutors and law

---

[39] This indicates compliance with *Kiszewski*, in which the Government should have disclosed or allowed inspection of impeaching disciplinary records of which it was *aware*. *See* 877 F.2d at 215-16.

[40] The Government further noted that it will timely provide its witness list and expert disclosures as the trial date approaches, and Ahorrio already knows some likely witnesses, such as Kennard and Orndorff. ECF No. 68 at 8.

enforcement, and the Government need not "conduct disciplinary inquiries into the general conduct of every officer working the case." *United States v. Robinson*, 627 F.3d 941, 951 (4th Cir. 2010).[41]

III. Conclusion

For the foregoing reasons, the Court will deny the Defendants' motions to suppress and exclude evidence, compel prosecution review of witnesses and disclosure of evidence, and sever.

_____     11/18/11

Date

_____

William D. Quarles, Jr.
United States District Judge

---

[41] *Jennings*, upon which Ahorrio partly relies, explained that the exercise of a district court's supervisory power over a prosecutor's conduct of criminal discovery is appropriate only when:

(1) a remedy for a violation of a recognized statutory, procedural, or constitutional right is required;
(2) judicial integrity must be preserved by ensuring that a conviction rests on appropriate considerations validly before a jury; and
(3) the [C]ourt seeks to deter future illegal [G]overnment conduct.

960 F.2d at 1491.

*Jennings* also noted that it is presumed that prosecutors will comply with *Brady*, and courts should "interfere in the practices of the executive branch only when there is a clear basis in fact and law for doing so." *See id.* at 1491-92. Ahorrio has not shown that his rights have been violated, or rebutted the presumption of compliance.